THE FIRST NATIONAL BANK OF SHELDON v. INGE-BRIGHT E. ARNTSON, Karen W. Arntson, Anders M. Arntson, and The Minneapolis Threshing Machine Company, a Corporation, The Kratt Realty Company, a Corporation, D. C. Cullen, R. A. Hinds and N. B. Hannum.

(145 N. W. 1056.)

Transfer — fictitious — title — encumbrance — payment — judgment — amount — taxes — decree of foreclosure.

   Plaintiff brings action to foreclose a second real estate mortgage for over

$3,000. A, mortgagor and owner, defends, contending that by a deed executed to the Kratt Realty Company, a holding corporation for the plaintiff bank, plaintiff became owner of land covered by plaintiff's and other mortgages and liens aggregating over $7,500, under an agreement whereby plaintiff assumed and agreed to pay all indebtedness secured by encumbrances against said land.

*Held:* Said transfer was a fictitious one procured to be made by A, and that neither plaintiff nor the Kratt Realty Company took title, nor agreed to pay any encumbrance on the land; and plaintiff is entitled to a judgment for an amount aggregating $4,747.44 on March 1, 1914, with accruing interest from that date, and any payments made by plaintiff on the first mortgage lien, or any taxes paid by plaintiff to protect the mortgage foreclosed, together with costs of trial and appeal and a decree in foreclosure directed to be entered accordingly.

Opinion filed March 5, 1914.

Appeal from the District Court of Ransom County, *Allen,* J.

Reversed and judgment directed for plaintiff.

*Pierce, Tenneson, & Cupler,* for appellants.

There was no merger of the plaintiff's lien. May v. Cummings, 21 N. D. 281, 130 N. W. 827; 2 Pom. Eq. Jur. 3d ed. §§ 791–794; Satterlund v. Beal, 12 N. D. 125, 95 N. W. 518.

To destroy the effect of legal instruments affecting the title to real property by imposing an agreement resting in parol, the evidence must be clear, satisfactory, specific, and convincing. Forester v. Van Auken, 12 N. D. 175, 96 N. W. 301.

The parol agreement, even if proved, would not prevent foreclosure. Tronson v. Colby University, 9 N. D. 563, 84 N. W. 474; 22 Cyc. 80, 87 & 103, note 52.

The bank was not a party to any such agreement. May v. Cummings, 21 N. D. 281, 130 N. W. 827.

*Rourke & Kvello,* for respondents Arntsons.

Appellant agreed to assume all encumbrance of record. The findings of the trial court are presumed to be correct. Rindlaub v. Rindlaub, 19 N. D. 352, 125 N. W. 479; James River Nat. Bank v. Weber, 19 N. D. 702, 124 N. W. 952; Ruettell v. Greenwich Ins. Co. 16 N .D. 546, 113 N. W. 1029; Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; Dowagiac Mfg. Co. v. Hellekson, 13 N. D. 257, 100 N. W. 717.

*Lawrence & Murphy,* for respondent Minneapolis Threshing Machine Company.

The question is whether or not the bank took the title to these mortgaged lands in satisfaction of the mortgage. Tronson v. Colby University, 9 N. D. 559, 84 N. W. 474.

Goss, J. This is a trial *de novo.* Plaintiff, the First National Bank of Sheldon, appeals from an adverse judgment, and seeks foreclosure of its mortgage on land in Ransom county once belonging to I. E. Arntson, mortgagor. Arntson had encumbered this land with a first mortgage of $2,000, upon which $575 principal had been paid, after which came the plaintiff's mortgage, amounting, with interest, to over $3,000, past due, with a third mortgage past due for $700, and interest to the Minneapolis Threshing Machine Company, after which came one or more judgments and mechanics' liens, running the aggregate debt against the farm to approximately $7,500. The amount is not in dispute. The value of the land is variously fixed by the witnesses at from $5,500 to $9,500. At the time of trial the 1911 and 1912 taxes had not been paid. Whatever equity Arntson had left in the land was speculative, dependent upon conditions, sale, and purchaser. It is admitted that the mortgagor had, for a considerable length of time prior to April 17, 1912, the date of the occurrences under investigation in this suit, been attempting to rid himself of this indebtedness by finding some financially responsible party who would accept a deed to the land and assume the encumbrances against it. He had, some considerable time prior thereto, executed a written agreement with one Wilsie, a real estate agent, whereby Wilsie might sell the land for him to some person of financial responsibility, able to assume payment of such indebtedness, with the understanding that Wilsie might retain whatever he could get from the purchaser for the equity in the land over and above the indebtedness thereon. Wilsie had then procured the land to be deeded by Arntson to one Hines, a purchaser, in which deal Wilsie got a stock of groceries and crockery from Hines for his services, Hines assuming said encumbrances. Hines proved financially irresponsible and unable to take care of the past-due indebtedness, whereupon Arntson, contending that the delivery of the deed to Hines was obtained through misrepresentation, brought an action to set the same

aside, and filed a *lis pendens* against the land. Hines had gone into possession and leased the same to one Monroe for the crop season of 1912. Hines's deed from Arntson had not been placed of record, apparently because of unpaid delinquent taxes against the land that had to be paid prior to recording deed. The plaintiff had been obliged to pay two successive years' interest, amounting to $171, and subsequent interest thereon, to protect its second mortgage from foreclosure of the first mortgage, and the interest on its own mortgage was a year and a half overdue, and it was about to foreclose for a sum in excess of $3,000 and past-due interest on its mortgage and two years' unpaid taxes. Arntson had been county auditor of Ransom county for two years, and was worrying under the financial load he was carrying, as the land was yielding no returns, with the prospect that in spite of his pending action to cancel the deed given Hines, the latter would be in possession and crop the farm or obtain the proceeds therefrom for the coming season. The plaintiff, of course, had whatever advantage obtainable from foreclosure, and did not care to sit by and see its debt increase or the crop for the ensuing year go to others. Hines had an interest in the property to the amount of the stock of goods turned over to Wilsie, and refused to surrender his unrecorded deed. Under this condition of affairs the parties met on April 17, 1912, at the plaintiff's bank, which was also the office of the subsidiary Kratt Realty Company, whose managing officers were the cashier and president of the plaintiff bank, this company being the usual holding company with which to transact collateral real estate business then forbidden by the national banking law to be conducted by the bank. This meeting was under prearrangement between Arntson, Hines, and Wilsie. Arntson's purpose was to procure an extension of time on his indebtedness until fall, and to see if Hines could not be induced to part with his deed and accept in lieu thereof a written option to sell, that he might find a purchaser able to take care of the encumbrances and get reimbursement himself by a resale. Before negotiations had gotten far along, a difficulty arose between Arntson and Hines. Kratt, managing officer and president of the bank, interceded, and took Arntson into a back room, where considerable time was spent between them, formulating some arrangement that would adjust matters between the bank, Arntson, and Hines, and at the same time satisfy and safeguard their interests. On the exact terms of the deal

there made between these two men turns the decision of this lawsuit, as but matters of fact are involved. Arntson claims that the deal there made, and consummated later that day, was that the bank should purchase this land for the amount of outstanding encumbrances against it, to be assumed and paid by the bank, and, for the purpose of convenience, title was to be taken to the Kratt Realty Company, for and on behalf of the bank, with the mortgages and notes to be later returned to him as taken up by the bank. On the contrary, Kratt claims that Arntson made the proposition to him that as Arntson was unable to deal with Hines and recover the deed outstanding, but that as Hines was willing to accept a written contract from the bank, because it held the heavy encumbrance and could immediately foreclose, that the bank should take Arntson's deed to the premises to enable him to procure the surrender by Hines of his deed to the bank. In other words, that the transaction, although an apparent transfer to the bank or its holding company, was in reality for the purpose of procuring the outstanding deed to be surrendered, obviating the necessity of prosecution of the lawsuit against Hines, thereby securing Arntson the right to the crop for the season then opening, and giving Hines an opportunity to find a buyer able to pay up all the claims. Both contentions are plausible.

On emerging from the back room, Hines and Wilsie were given to understand by Kratt that either the bank or the Kratt Realty Company was behind the deal. A deed was then prepared from Arntson to the realty company, and given to Arntson, to be completed by his wife's signature and acknowledgment, subsequently procured, to be then returned for recording. There is no clause in the deed whereby the grantee assumed and agreed to pay any encumbrance. Contemporaneously the bank executed to Hines and Wilsie a listing agreement, wherein they were given until October 1st following the exclusive right to make a sale, and were to have all over and above the encumbrances as their commissions, the bank to furnish "clean, marketable title and abstract." The bank was to retain the current year's crops, "to be applied, first, on seed, and balance on indebtedness." The other important clause of the agreement reads: "The easiest terms I will sell on will be cash payment of interest on notes and mortgages on land from September 10, 1910, to date of sale; also an amount equal to principal

and interest of mortgage of $700 to threshing machine company (to be paid us); balance one year's time. Purchase price to be an amount equal to total encumbrances and liens, with interest. Interest on deferred payments 12 per cent per annum to date of sale." The written lease of Hines with Monroe for a portion of the land was turned over to the bank, with the deed, some days later, after the auditor defendant had himself procured the recording of his own deed to the Kratt Realty Company, after he had made an indorsement thereon of taxes paid and transfer entered, which indorsement, he admits, was contrary to fact in that he has never, to the time of trial, paid the taxes for 1911, then delinquent. There is also a dispute as to whether he authorized the bank to advance the expenses for seed and cropping, something over $600, during the season of 1912, he claiming that he had nothing more to do with it, and that the transfer was an absolute sale to the bank; while the plaintiff claims the same was not a sale, and that Arntson expressly authorized the bank to expend such money. The crop for the year reimbursed that expense and some $46.15 besides. Kratt testifies that when he and Arntson were having their secret understanding, he told Arntson that he would not delay foreclosure, but that junior liens and encumbrances would be cut off, or redemption forced, inasmuch as the first and second mortgages would amount to as much as the land was worth before title could be gotten by foreclosure, he having no confidence in the ability of Hines and Wilsie to make a sale, and would not delay foreclosure. Arntson testifies there was to be no foreclosure. Within two weeks, foreclosure by advertisement was begun, which was enjoined by Arntson, whereupon plaintiff began this foreclosure by action, in which Arntson defends on the ground that plaintiff bank has title to and has assumed and agreed to pay all the encumbrances upon the land, and that plaintiff should not be permitted to defeat the liens of the junior encumbrancers by foreclosure, but instead should be compelled to pay them in full, and thereby relieve Arntson from all of his indebtedness so secured. The trial court in its findings found that plaintiff had in fact agreed to assume all such encumbrances.

We will now consider the evidence under the contentions of the parties. The testimony of Arntson is far from satisfactory. In many respects it is contradictory, and appears inconsistent with the rea-

sonable probabilities. In business, people usually act from mercenary motives, and men of business experience, as is the usual banker, do not needlessly involve themselves in liabilities where they have nothing to gain by so doing. The bank had the second lien, amounting to about $4,000, past due, and was about to foreclose. It had favored Arntson by carrying him for eighteen or twenty months past due, and accumulated interest, besides payments made of first mortgage interest. The crop for the coming season it could obtain by sale on foreclosure of its land mortgage, and the matter would be put in position to ripen into title unless the junior encumbrancers would redeem from the foreclosure, which in such event would convert the claim into money. The issue here presented tends to establish the improbability of a redemption, as the real issue in this lawsuit is whether Arntson will pay his own debts, either personally or by a redemption by junior encumbrancers, or whether the bank, whose responsibility is beyond question, must pay them. The written instruments in evidence appear to favor plaintiff's case, from the fact that the deed contains no assumption of debt, which deed admittedly was prepared in the presence of the auditor, a man from whom we naturally must expect sufficient business ability to know the importance of the omission of such clause. This was prepared by Kratt, it is true, but it would seem that if the company was assuming these encumbrances the fact would be mentioned. It is disclosed in the testimony that Hinds and Wilsie were suspicious that this transfer was but a fake, from the fact that Hines refused to surrender up his deed to the bank until after the deed to the realty company should be placed of record, and this in spite of the fact that it was to the interest of Wilsie and Hines, as well as Arntson, that the deal should be found to be according to Arntson's version, as such a finding in effect consummated the very object of the former written agreement between Wilsie and Arntson by shifting all this indebtedness upon the bank, which thereby relieved Wilsie from ever accounting to Arntson for the stock of goods he had obtained through what is denominated by Arntson's own testimony as misrepresentation or deceit; while Hines was getting what he desired, a written assurance of the right to sell this property with terms of sale fixed, even though after foreclosure had. And in the land listing agreement is a clause that speaks strongly in plaintiff's behalf, reading: "Regarding the current year's crops

retained to be applied, first, on seed, and balance on indebtedness."
If the realty company was actually buying this land for the amount of
the then encumbrances upon it, it would seem somewhat inconsistent
with reason that they would agree to apply the proceeds of the crop upon
Arntson's indebtedness, as that is what this clause must refer to, in-
asmuch as it is not contended that either Hines or Wilsie owed the bank
a cent.  It is a strong circumstance in favor of the plaintiff that the
written instrument, executed contemporaneously with the deed (under
which it is contended that the indebtedness was shifted upon the bank
and thereby canceled the notes and mortgages to be returned), should
nevertheless stipulate such notes should remain unpaid for the purpose
of applying the proceeds of some 200 acres of crop thereon to Arntson's
benefit.  And the effect of this clause is to cause doubt on the truth
of Arntson's testimony, to the effect that nothing was said about the
bank cropping the place or furnishing seed or paying expenses, because
this clause provides for a reimbursement for such expense.  If it be
contended that the object of this provision was to secure a reduction of
the amount that would have been paid by Hines and Wilsie had they
affected a sale, the equivalent of giving them the portion of the crop as
an incentive for making it, we are confronted with the question of how
such a claim could be made when, under the theory of the respondents,
the crop must belong to the bank, pursuant to the tenor of the whole
deal and as further evidenced, as they claim, by the surrender to the
bank of the written lease.  Arntson cannot consistently contend a sale
of the real estate to the bank and at the same time claim that the bank
was to make a gift of half the crop raised the ensuing year to Wilsie and
Hines.  The only indebtedness that existed or that was in contemplation
of the parties was Arntson's indebtedness, and the last instrument exe-
cuted that day mentions his indebtedness, and provides for the appli-
cation thereon of proceeds to be realized six months thereafter.  This
can, in no way, be harmonized to fit Arntson's claim, while, on the
other hand, it is absolutely consistent with the plaintiff's case and testi-
mony.  Had $10,000 worth of crop been raised that year, we venture
Arntson would be calling attention to this provision were the claims
of the parties reversed.

We place no significance in the fact that the bank carried an ac-
count for farming expense on its bank books under the heading of

"Farm Account." The bank had expended the money, and whether the charge was made on its books as against the farm or its realty company or Arntson would seem to be of little significance, excepting that naturally it would not be charged against its own subsidiary company. We place little importance on the testimony of Wilsie and Hines. Both are apparently interested in a recovery by Arntson. Besides, all their testimony may be taken as true and still no light be thrown therefrom on what the secret understanding was that was had between Arntson and Kratt in that back room.

Kratt was examined at length, both by counsel and the court, on the provision appearing in writing in the listing agreement, mentioning that the principal and interest of a $700 note to the threshing machine company should be paid to the bank in case of sale. It provided that on sale all interest on the notes and mortgages on the land from September 10, 1910, to the date of sale, had to be paid. This evidently had reference to the first and second mortgages only, and was then followed with a stipulation that "an amount equal to principal and interest of $700, to threshing machine company to be paid us; balance one year's time." This does not provide that the third mortgage of $700 and interest should be paid or discharged, but instead that an amount equal to that mortgage and interest should be paid the bank. The reason seems plain. The bank had by this listing agreement bound itself to transfer title to Hines and Wilsie if they effected a resale. As a condition precedent thereto this contract provided that all back interest on the first and second mortgages was to be taken up. Its security in the land would then be that much better, and it could, on receiving the amount of the third mortgage, either apply that amount on its prior mortgage, and subsequently transfer subject to a liability to pay the machine company mortgage, or it could pay the mortgage of that company as it saw fit, in which latter case it might procure a discount from the company to inure to Arntson's benefit, as explained by Kratt's testimony. In either event the bank was not subjecting itself to a loss of security, nor, in the event of no sale being made, placing itself under obligation to pay the machine-company mortgage. There is some testimony that the subject of discounting this mortgage, if a sale was effected, was considered, and that Arntson would get any benefit of it. It may signify a willingness to keep the machine

company at a disadvantage in the collection of its debt, but if so, under Kratt's version, it would inure to the benefit of Arntson, whom Kratt at the time was helping out of the difficulty that his lack of business foresight had drifted him into. And from the fact that this paper was prepared at the same time as the deed from Arntson to the realty company, it would seem that any imputations against Kratt must apply with equal force to Arntson, the beneficiary acting with knowledge. We realize that on this point the testimony of the defense is that Arntson is in supposed ignorance of that part of the deal, and what was done between Kratt, Hines, and Wilsie, and had left the bank after the deed was drawn by which title was to be transferred to the realty company. But that smacks of the improbable.

We do not view Arntson's violation of the law as an official in making a false indorsement of taxes upon his own deed as strengthening his testimony. (Abs. pp. 65–67–79.) It may be urged that the fact that he was ridding himself of his obligations was a sufficient incentive for him to take chances on the consequences of thus getting the deed recorded. But if the bank was as anxious as he tries to make it appear, to knowingly assume $7,500 worth of encumbrances for this land, one would reasonably expect a public officer of his standing to have had credit enough with that same bank to have borrowed a sum sufficient to pay one year's tax on this land, or to have been able to obtain it elsewhere. Besides, this tax was a lien the bank must have assumed under his own testimony, yet he never has contended but that he must pay this tax. His conduct and claims in this respect do not square with his defense. Anxiety to record the deed alone would seem to be more reasonably explained under the assumption that during the negotiations, and while Arntson was deceiving Hines, using the bank as an instrument to do so, to induce him to part with the deed, the subject-matter of a pending lawsuit (Abs. pp. 41–56–57–76–77–78), he also conceived the idea that might naturally arise in the mind of a so-called curb-stone lawyer, that because of the fact that the bank had taken this deed to its realty company, without any covenant concerning encumbrances, it had in law assumed them, and from this as a basis a claim that it had intentionally done so could be urged with force and plausibility, and could be easily supported by testimony amounting to mere conclusions. It is more probable that this deed was recorded in furtherance of such a precon-

ceived design, which would actually furnish a sufficient motive for the act, than that something else actuated it. Something of this kind was lurking in the mind of Arntson as a reason why he failed to pay any attention to the contents of the listing agreement, if his testimony to that effect is true, as he did not desire to know its contents, naturally surmising that the bank, acting under a belief that his indebtedness to it still continued, would provide therein for the application of the crop upon it or his repayment of cropping expenses; and the provisions that would probably be inserted, concerning the payment of Arntson's debts on this land in case of a resale, if made with his full knowledge, would make an attempted explanation in harmony with the theory here advanced by him, embarrassing to say the least. He attempts to avoid the force of all this by denying knowledge, in evasive testimony, of the contents of the listing agreement. (Abs. p. 76.)

Kratt has admitted that Arntson asked him, "What about these mortgages and notes; when will they be turned over to me?" And this is given much prominence by respondents on the theory that unless Arntson actually understood the deal was as he here claims it to be, why such a statement. In fact in this connection he was asked b yexamining counsel "if there wasn't some understanding or suggestion, why, in your opinion, would Arntson have asked you that question." To which he replied: "Because I don't think he understood it." From this answer it is also argued that Kratt was taking advantage of Arntson, and leading him into a deal that he did not understand, in order to perpetrate a fraud on him, which fraud, when reduced to its final analysis, amounts to nothing more than that Kratt would exercise his right of foreclosure immediately, and intended to do so all the time. The statement he admits making is not inconsistent with any discussion concerning the return of the mortgages and notes in case of sale under the listing contract. Or again, it is very probable that had Arntson the scheme in mind of forcing an assumption of this indebtedness, he would ask such a question, however groundless it might be in fact or contrary to the understanding had between the two in the back room. From Arntson's own testimony it was probably during the noon hour that he conceived the idea of putting the bank into the condition its subsequent acts that day placed it with reference to this land. He admits he went there with no idea of selling the land to the bank or to

the others, but that subsequently he "wanted to present the idea that he was selling the land to the Kratt Realty Company or to them, and so he asked Kratt if he wouldn't come into the back room, where he could see him privately." (Abs. p. 41) Arntson says he then made the proposition to Kratt to do what he claims resulted, the taking over of the land for the encumbrances against it. When Arntson saw the deed prepared to the Kratt Realty Company, and that Kratt had been induced to list the land back in the bank's name, it is not improbable that he saw the position into which Kratt had unwittingly placed himself in his desire to accommodate the man who had already obtained so much accommodation at his hands. To consummate this scheme all that was thereafter necessary, as Arntson believed, was to get this deed on record, which he did with all possible speed. Then he kept still, never demanding his notes and mortgages, even to the time of trial. Kratt first discerned Arntson's intentions two weeks later, when his foreclosure by advertisement was enjoined, when Kratt immediately offered to deed back the land to Arntson, which offer, of course, was refused. Kratt, then discovering the position he was in, had no alternative but to go ahead and crop this land, and make the best of a situation that on its surface appeared to be a purchase, and hope for a sale to be made by Hines to bring him in his money.

A careful study of the entire record, with the idea of trying to find some reasonable motive disclosed for the bank to have agreed to have assumed these encumbrances, results in failure. There is no way in which the bank could have defrauded Arntson out of a dollar under the written agreements. If this property had increased in value to $15,000, for which amount a sale had been effected, the listing agreement would have rendered the overplus to Arntson as the sole possible beneficiary. The machine company in its brief says the bank was influenced by the opportunity to procure title to this property for the amount of the first and second mortgages, so that it could resell it for an advance of $2,000 or more, should the opportunity afford during the summer. But this ignores the fact that the bank had, by written agreement, placed the proceeds of the sale where they must be applied, on the debt on the land, and all inure to Arntson's benefit, and that it could not itself have sold before October 1, 1912, without cleaning up encumbrances under the contract, even if it did foreclose at once. We

fail to see in the entire record where a motive is disclosed for plaintiff to deal underhandedly or dishonestly with Arntson, while, on the contrary, Arntson is interested in shifting his encumbrances upon the bank, thereby accomplishing what he attempted to do to others many months before ever he went to the bank this day in question. His allowing interest to default for years, as here done, plainly indicated he never intended to redeem from his indebtedness. His version is so palpably absurd from any standpoint, and so improbable from an anaylsis of his own testimony, as to be of little weight. His testimony as to what occurred between him and Kratt is conflicting, and does not appear to be straightforward and consistent. Besides, the proof is as strong of collusion between Arntson, Hines, and Wilsie to purposely place the bank in the position Arntson now contends for, as it is that Arntson is right and Kratt is wrong. Had these three men conspired to procure the bank to do as it has done, that Arntson might make the claim now advanced that the bank has assumed the indebtedness, and this without the bank agreeing to do so, they would have done exactly as they have done.

Hence we cannot agree in the findings of the trial court. We realize its superior advantages in arriving at the truth, and are reluctant to disturb its findings of fact, and would not do so if we did not feel constrained that its findings are not only unsupported by the preponderance of the evidence, but contrary to the great preponderance thereof, and inconsistent with and contrary to every reasonable probability we believe can be drawn from the testimony. Inasmuch as respondents have in their brief quoted and relied upon Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454, and similar authority, to the effect that before a court should set aside a deed the proof should be clear, convincing, and satisfactory that the deed does not evidence a bona fide transfer, it is probable that the decision of the lower court was made more upon a theory of failure of proof on the part of plaintiff to overcome the effect of the deed in evidence, than it was that all the evidence in the case did not preponderate in plaintiff's favor. But this case differs from the ordinary proof in action to set aside a deed in that contemporaneous with the deed in question between the parties interested, as a part of the same transaction to be construed with the covenants of the deed, is an equally binding written agreement contain-

ing matters wholly inconsistent with the theory that the deed was such in fact, and which, considered with all the other testimony in the case, does establish clearly and convincingly that the deed never was intended to be a conveyance, but an instrument evidencing only a part of the entire transaction. The deal taken as a whole did not amount to a conveyance of title as between Arntson and wife and the bank, or the realty company, but was merely a means to an end, the causing of the surrender of the outstanding deed without the necessity of prosecution of the lawsuit brought for its cancelation.

We find, therefore, that the mortgage sought to be foreclosed and owned by plaintiff is valid and unaffected by the deed in question, which deed should be set aside as invalid; that plaintiff should have judgment against defendant Arntson and his wife, Karen W. Arntson, for the full amount of which judgment is asked in the complaint, to wit, $2,809.-65, with 12 per cent interest from December 1, 1908, and $85.50 and interest at 10 per cent from September 10, 1910, and $85.50 and interest at 10 per cent from December 1, 1911; all amounting March 1, 1914, to $4,799.66, less the sum of $46.15 and interest thereon at 7 per cent annum since November 1, 1912, all amounting to $52.22, leaving $4,747.44 as the amount of principal and interest due plaintiff March 1, 1914, to which may be added any unpaid taxes and any payments subsequent to trial, made by plaintiff, of interest or principal of the first mortgage running to the Ransom County Immigration Association, and paid to protect the second mortgage here foreclosed, which amounts may be assessed by the trial court on plaintiff's application on ten days' notice to respondents' counsel, obviating necessity of service of notice of trial or placing of this case on the regular trial calendar, that collection by foreclosure may not be needlessly delayed; that plaintiff have foreclosure of the premises described in the complaint for the amount of such judgment, which judgment and foreclosure will include plaintiff's costs and disbursements on trial and on appeal.

Plaintiff is entitled to judgment against Anders M. Arntson to the amount of one half of the total judgment on foreclosure entered against I. E. Arntson and wife, and judgment against Anders M. Arntson will be entered accordingly. The pleadings and the proof establish that subsequent to these mortgages I. E. Arntson and wife conveyed a portion of the premises to Anders M. Arntson, the deed covenanting that the

grantee assumed and agreed to pay, as a portion of the consideration, one half of the mortgages to this plaintiff and the Ransom County Immigration Association. No general execution will issue against the property of Anders M. Arntson, however, until after a return made and filed of the proceedings had on foreclosure of the land mortgaged, to the end that said land may be first applied to the payment of the debt of the mortgagees and for which foreclosure is awarded. Any deficiency judgment remaining after foreclosure sale may be collected as provided by law by execution against the property of I. E. Arntson, K. W. Arntson, and Anders M. Arntson.

Judgment and decree of foreclosure ordered entered accordingly.